EXHIBIT 5 (ATTACHMENT)

1) Judge Ellen L. Hollander's letter from Antoine Harris, dated October 4, 2021;

2) Sentencing Monitoring Computation Data as of 10-5-2021;

3) Individual Needs Plan — Program Review as of 8-17-2021;

4) Male Risk Pattern Score as of 8-19-2021;

5) Certificate of Completion: Drug Abuse Education Course, 4-16-2019;

6) Certificate of Achievement: Addiction Anonymous Graduation, 7-10-2019;

7) Letter, Transcipt of Grades and Diploma from Stratford Career Institution, 7-23-2021; and

8) Antoine Harris Sentencing Transcript dated 12-17-2018.

Date: October 4, 2021

Mr. Antione Harris #63414-037
Federal Correctional Institution
Petersburg Medium
Post Box 1000
Petersburg, Virginia 23804

RE: Compassionate Release

The Honorable Judge
Ellen L. Hollander
U.S. District Court
District of Maryland
Northern Division-Baltimore
101 West Lombard Street
Baltimore, MD 21201-2605

Dear Your Honor:

I thought I'll take this opportunity to express a few words of gratitude for your leniency and encouragement upon being sentenced on December 17, 2018. This letter serves as an opportunity to inform you of my highs and lows while here. And an update as to the progress, obstacles and why I believe I'm ready for another chance to be a productive member of society.

When I was transferred to Petersburg Medium, I immediately continued rehabilitating efforts to curve my criminal behaviors, selling and using drugs. I haven't participated in any illegal activities since my arrest in April of 2017. It's plenty of those behaviors still existing inside the BOP. The first program I participated in, and graduated, was Addiction Anonymous. It not only targeted substance abuse but addictive behaviors as well. I excelled and found a passion to help others while helping myself. In short, I became a facilitator upon graduation.

I completed multiple programs to fill the void of wanting more to know about many subjects that would increase my potential. I studied hard. I surrounded myself around people who shared the same positive mindset. I even Coached a football team of individuals who were all from a different part of the world and won a championship. I was awarded Coach of the Year 2019.

This incarceration has brought me closer to my Mother, Fiance' and children. They have been my biggest supporters. I've received mail from them all, spoke with them on the phones throughout my time and received visits as well. This time has shared new light and purpose on the rest of my life.

I received a blemish on my adjustment record that I'm not proud of. When Petersburg went into phase 1 of the lockdown due to covid, April 1, 2020, I received an infraction for possession of a cell phone. As you may already be aware of, the BOP is flooded with cell phones. However, at that time the lower tier and top tier was allowed to take showers, use the phone, and charge their MP 3's and radios at the charging stations, but at different times. The lower tier was allowed out first. I was housed on the top tier at the time. When we came out afterwards, I went to the charging station which was designated by cars. That's a terminology use to distinguish the different cities and state people come from. Baltimore has a lockbox at the charging station and to my surprise, a cell phone was inside. (These lockboxes has since been removed.)

The phone belonged to a person who slept a few feet away from the lockbox on the bottom tier. When I approached the lockbox he asked me to pass him the phone in order for me to charge my radio and MP3 player. Without thinking, I attempted to pass it to him and was caught doing it. The only thing I was thinking about was having to lockdown without having any of my devices charged. It was resolved knowing the cell phone didn't belong to me, but of course I had to accept responsibility for my part. At the time, my Counselor, Ms. Thompson, who also was my employer, was there and investigated the matter. If there's any doubt of my story, you can feel free to give her a phone call. She's still a Counselor on B-north. Since then I've maintained my progress and positive thinking.

----------------------------------------------------------------------------------------------------

As you may notice, my male pattern risk score for recidivism displays medium. It displays 31 points in the general column indicating medium and 19 points in the violence column, which indicates low. I was actually low in the general column and minimum in the violent column, points were 31 and 18. However, my case manager informed me that the BOP changed the points to 30 instead of 31 to be low a year ago, more or less. That infraction is the reason why it changed in the first place. But that's been almost two years ago and I'm back to 31 points, which has now become medium instead of low like before. However, I can assure you that I'm much less of a concern to return to prison yet be a violent person. The only violent crime I took part in was when I was 19 years old, the year December 1, 1990. Since then I totally did away with that part of the streets. As you mentioned at my sentencing, there was no weapons, acts of violence or even talk of violence throughout the investigation into my arrest. (see sentencing transcript.)

On another note, the corona virus has offered a very challenging time for many Americans. I survived a threatening moment when I contracted the virus in December of 2020. I was so sick that I requested a test for covid. That same day I had to be taken to the emergency room of a local hospital to be treated. I was administered oxygen, fluids, x-rays and other things to break my fever. (see medical files) I was diagnosed with covid and pneumonia on December 28, 2020. The fight didn't end there, once back into the institution, my symptoms worsened and I had to be taken to the infirmary for more medical attention, oxygen, fluids and antibiotics. The Doctor actually issued instructions on what to prescribe and do upon my arrival back, but those orders weren't followed until I sought help by pushing the emergency button in my cell before I passed out again.

Throughout the process, I wasn't allowed to call my Mom, not at the hospital or the institution until a week later. Nobody called Mom on my behalf although I asked them to. When I spoke with my Mom, she was very worried and informed my Fiance, children and family. That sparked a wave of concern and fear that I wouldn't survive. My older daughter, Shannon Harris, you may remember reading a letter that she wrote on behalf of me at sentencing; took the news very hard and became very depressed and ill. She has since then been hospitalized on a number of occasions. I finally got a chance to call her a month later to let her know I would be okay and that it was important for her to pull herself together, but her struggle continued. She vowed to advocate for my freedom by constantly calling the warden and reaching out to Attorney's and congress for answers. I explained the process and the waiting period, but she insisted on doing it her way. I tried to convince her that I was fine and it was best for her to pull herself together, when I was actually still feeling the symptoms physically and psychologically.

My fears of contracting the virus still exist now that the Delta Variant is moving in fast. There is talk of another lockdown throughout the BOP. We are still limited to movement and other restriction to this day. We have not yet returned to normal operation. Not very much is known of the Delta Variant to me. The feeling of dying and surviving covid was another eye awakening experience like when you gave me leniency upon my sentencing. I thanked God and then you for another chance to be a better person, Dad, Grandfather and Husband. Feeling like death made me revisit all the harm I done to myself, family and others for the greater good. Through God, first responders saved my life and my continued effort for success.

I'm not sure how the impact of my compassionate motion will be considering I've had covid and was vaccinated. A lot hasn't been discovered about how effective the vaccine may hold up now. Talks of a booster shot is out there, something that I haven't got yet. How will either hold up against the Delta Variant. (see cited cases on person who was released after fully being vaccinated after covid and news about the delta variant.) I don't want to relive contracting covid again or contract the Delta Variant. I'd love to be home with loved ones, surrounded by a setting where I'm properly loved and looked after, and where I can get faster assistance in case of an emergency.

Through it all, however; I continued to work hard behind the door. I manage to obtain my diploma as a Drug and Alcohol Specialist (Counselor) through Stratford Career Institution. As I stated at sentencing, I wanted to become a counselor and help myself and many others. (see sentencing transcript.) This ultimately will be my way of literally joining the war against drugs. I been on the other side so I know I can relate to the many causes of why people use and sell drugs. I'm taking my passion to another level, starting in here. I've offered my assistance with counseling other inmates and in particular, was assigned a client who I shared the same cell for a few months. (My counselor, Mr. Simon of B-south can verify that. Feel free to call him as well.) I've done nothing but remain positive and undeterred from rehabilitation.

Upon my release, I plan to take a job at Arby's. My Fiance' has worked there a few years now and has become the General Manager. That job will allow me to be employed, get medical benefits, assist with helping pay bills and raise our little daughters until I can find work in my field of study. That's my ultimate goal. The house and job is in a good community. (see release plan)

In all, thank you for your time and deep consideration with my compassionate release. I'll be transferring to a low security prison in 60 days or less. Due to the pandemic, the program Non-residential and/or residential program has been something I

-------------------------------------------------------------------------------------------------

couldn't move up on the list to get. (NRDAP AND RDAP) With completion of either one of those programs, my recidivism points would have gone way below the low range. Everything I've done has been from an outside school and housing unit programs, anything from May of 2020-2021.

I almost forgot to mention I wrote a few books. The first ones are called, "Hustled Dreams." Part 1 and Part 2. It's a true story of my life. The book tells a story of a little boy who once knew the positive ways of making money and having fun, only to succumb to the negative environment and peer pressures that so many kids are at risk to falling to. It ends with the encouraging words you stated to me about my potential and finding a new path to travel. Remember you stated, "You are not getting any younger." Among other things! I also wrote two children books. One is called "Sticks and Stones," it's a poetry book about bullying. (Sticks and Stone may break your Bones, but words will never hurt you.) The other book is called, "Why Can't I Read!" It's an ABC book. It's a dialogue between a mother and a child about how learning your abc's will help you learn to read. My goal is to get them published through Amazon. I'll be sure to update you when they are published.

Sincerely yours,

Antione Harris
63414-037

REGNO..: 63414-037 NAME: HARRIS, ANTOINE


```
FBI NO...........: 40182MA9          DATE OF BIRTH: 07-26-1971  AGE:   50
ARS1.............: PEM/A-DES
UNIT.............: B                  QUARTERS.....: B01-029L
DETAINERS........: NO                 NOTIFICATIONS: NO
```

HOME DETENTION ELIGIBILITY DATE: 12-28-2024

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  06-28-2025 VIA GCT REL


----------------------CURRENT JUDGMENT/WARRANT NO: 010 ------------------------

```
COURT OF JURISDICTION...........: MARYLAND
DOCKET NUMBER...................: ELH-1-17-CR-00322-00
JUDGE...........................: HOLLANDER
DATE SENTENCED/PROBATION IMPOSED: 12-17-2018
DATE COMMITTED..................: 03-27-2019
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO
```

```
                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.:  $100.00        $00.00          $00.00       $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

 REMARKS.......: DKT #ELH-1-17-CR-00322-003

------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....:  391     21:846 SEC 841-851 ATTEMPT
OFF/CHG: 21:846 CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES (CT 1S)

```
 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   114 MONTHS
 TERM OF SUPERVISION............:     5 YEARS
 DATE OF OFFENSE................: 06-30-2017
```

REGNO..: 63414-037 NAME: HARRIS, ANTOINE

------------------------CURRENT COMPUTATION NO: 010 -------------------------

COMPUTATION 010 WAS LAST UPDATED ON 07-29-2020 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 07-30-2020 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

DATE COMPUTATION BEGAN..........: 12-17-2018
TOTAL TERM IN EFFECT............:  114 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:   9 YEARS      6 MONTHS
EARLIEST DATE OF OFFENSE........: 06-30-2017

JAIL CREDIT.....................:   FROM DATE      THRU DATE
                                    04-12-2017     04-12-2017
                                    04-15-2017     12-16-2018

TOTAL PRIOR CREDIT TIME.........: 612
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 472
TOTAL GCT EARNED................: 175
STATUTORY RELEASE DATE PROJECTED: 06-28-2025
ELDERLY OFFENDER TWO THIRDS DATE: 08-14-2023
EXPIRATION FULL TERM DATE.......: 10-13-2026
TIME SERVED.....................:   4 YEARS      5 MONTHS     22 DAYS
PERCENTAGE OF FULL TERM SERVED..: 47.1
PERCENT OF STATUTORY TERM SERVED: 54.5

PROJECTED SATISFACTION DATE.....: 06-28-2025
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 2-20-20 GCT UPDT PURSUANT TO FSA B/RLB; 4-21-20 GCT B/TNN;
                7-29-20 JC UPDT DUE TO NEW INFO FOUND FROM COP OUT B/PLG.

G0000      TRANSACTION SUCCESSFULLY COMPLETED

Sentence Monitor Computation Sheet
~~custody points sheet~~



| | | |
|---|---|---|
| Facility: | PEM PETERSBURG MED FCI | Proj. Rel. Date: 06-28-2025 |
| Name: | HARRIS, ANTOINE | Proj. Rel. Mthd: GCT REL |
| Register No.: | **63414-037** | DNA Status: PREBOP TST / 12-26-2018 |
| Age: | 50 | |
| Date of Birth: | 07-26-1971 | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| PEM | POUND AM2 | POUND AM ORDER | 03-04-2021 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| PEM | ESL HAS | ENGLISH PROFICIENT | 04-02-2019 |
| PEM | GED HAS | COMPLETED GED OR HS DIPLOMA | 04-02-2019 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| PEM | | POST SECONDARY EDUCATION | 08-11-2021 | CURRENT |
| PEM | C | DECIMALS FOR HOUSING UNT | 06-01-2021 | 06-07-2021 |
| PEM | C | SOFT SKILLS FOR HOUSING UNT | 03-01-2021 | 03-26-2021 |
| PEM | C | SELF PACED WELLNESS | 06-30-2020 | 07-20-2020 |
| PEM | C | BECOMING AN AUTHOR | 01-14-2020 | 05-16-2020 |
| PEM | C | PUBLIC SPEAKING (ACE) | 10-15-2019 | 12-13-2019 |
| PEM | C | PARENTING | 08-26-2019 | 10-28-2019 |
| PEM | C | MANLY MONDAYS | 07-08-2019 | 09-26-2019 |
| PEM | C | REALITIES OF REENTRY - MANCAVE | 06-22-2019 | 06-27-2019 |
| PEM | C | UNIVERSAL CHILDRENS DAY | 07-16-2019 | 07-25-2019 |
| PEM | C | RE-YOUR CREDIT REPORT | 06-12-2019 | 06-12-2019 |
| PEM | C | PARENTING READING PROGRAM | 04-19-2019 | 06-18-2019 |
| PEM | C | ADDICTIONS ANONYMOUS | 07-10-2019 | 07-10-2019 |
| PEM | C | STARTING A NON-PROFIT (ACE) | 03-28-2019 | 06-28-2019 |
| PEM | C | HEALTH FAIR | 06-17-2019 | 06-18-2019 |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

**Current Care Assignments**

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 04-03-2019 |
| CARE1-MH | CARE1-MENTAL HEALTH | 04-11-2019 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 04-03-2019 |
| YES F/S | CLEARED FOR FOOD SERVICE | 04-03-2019 |

**Current Drug Assignments**

| Assignment | Description | Start |
|---|---|---|
| DAP DIAG | DRUG ABUSE DIAGNOSIS PENDING | 06-01-2020 |
| ED COMP | DRUG EDUCATION COMPLETE | 04-16-2019 |
| NR WAIT | NRES DRUG TMT WAITING | 09-24-2019 |

**FRP Payment Plan**

| Most Recent Payment Plan |
|---|



**Individualized Needs Plan - Program Review** (Inmate Copy)
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: HARRIS, ANTOINE  63414-037

SEQUENCE: 02144677
Team Date: 08-19-2021

Most Recent Payment Plan

**FRP Assignment:**    **COMPLT**    **FINANC RESP-COMPLETED**    **Start: 10-10-2019**

Inmate Decision:    **AGREED**    **$100.00**    Frequency: **QUARTERLY**
Payments past 6 months:    **$0.00**    Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*\*\* NO ADJUSTMENTS MADE IN LAST 6 MONTHS \*\**

**FRP Deposits**

Trust Fund Deposits - Past 6 months:   $ N/A        Payments commensurate ?   N/A

New Payment Plan:   \*\* No date \*\*

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE  REVIEWED | 06-02-2021 |
| N-ANGER Y | NEED - ANGER/HOSTILITY YES | 05-30-2021 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 05-30-2021 |
| N-COGNTV N | NEED - COGNITIONS NO | 05-30-2021 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 05-30-2021 |
| N-FIN PV Y | NEED - FINANCE/POVERTY YES | 08-19-2021 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 05-30-2021 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 05-30-2021 |
| N-MEDICL N | NEED - MEDICAL NO | 05-30-2021 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 05-30-2021 |
| N-SUB AB Y | NEED - SUBSTANCE ABUSE YES | 05-30-2021 |
| N-TRAUMA N | NEED - TRAUMA NO | 05-30-2021 |
| N-WORK Y | NEED - WORK YES | 05-30-2021 |
| R-MED | MEDIUM RISK RECIDIVISM LEVEL | 04-28-2021 |

**Progress since last review**

Completed the correspondence course Drug and Alcohol Treatment Specialist on July 13, 2021, from Stratford Career Institute. Completed two the ACE classes Soft Skills on March 26, 2021, and Decimals on June 7, 2021. Has not participated in the Criminal Lifestyles or Non-Residential Drug Abuse programs as recommended. Has obtained employment but has not worked due to Covid-19. Has maintained family, community ties, and good personal hygiene since last review.

**Next Program Review Goals**

Enroll in the Criminal Thinking program offered through Psychology before next review period.  Maintain employment and earn good work evaluations when you are allowed to return to work. Participate in the Non-Residential Drug Abuse program before next review period. Maintain family and community ties through February 2022, via phone calls, visitation, and written correspondence. Maintain acceptable levels of unit sanitation and good personal hygiene through next review period.

**Long Term Goals**

Enroll in the RPP CMC Release Procedures, Employee Preparation, and USPO Supervision Requirements before June 2024. Participate in the Mock Job Fair before June 2024, to increase interviewing skills. Enroll in a Vocational Training program of choice before June 2022. Obtain a copy of birth certificate before December 2022, to assist with obtaining an identification card. Save $25 quarterly to assist with release expenses.

**RRC/HC Placement**

**Comments**

Finance/Poverty Need Screen
Is there documentation in the PSR of any of the following?
__ Any history of Bankruptcy
__ No bank account
__ No assets nor liabilities noted in PSR
X Debts noted in Credit Report or other sources
__ Tax Liabilities/back taxes
__ Unpaid alimony/child support
__ other indications of lack of financial management skills (specify)

# MALE PATTERN RISK SCORING

| Register Number: | 63414-037 | Date: | 8/19/2021 |
|---|---|---|---|
| Inmate Name: | HARRIS, ANTOINE | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| **1. Current Age** | > 60 | 0 | | 0 | |
| 41-50 | 51-60 | 7 | | 4 | |
| Click on gray dropdown box to select, then click on | 41-50 | 14 | 14 | 8 | 8 |
| dropdown arrow | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| **2. Walsh w/Conviction** | No | 0 | | 0 | |
| No | Yes | 1 | 0 | 0 | 0 |
| **3. Violent Offense (PATTERN)** | No | 0 | | 0 | |
| No | Yes | 5 | 0 | 5 | 0 |
| **4. Criminal History Points** | 0 - 1 Points | 0 | | 0 | |
| 7 - 9 Points | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | 24 | 8 | 12 |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| **5. History of Escapes** | None | 0 | | 0 | |
| None | > 10 Years Minor | 2 | 0 | 1 | 0 |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| **6. History of Violence** | None | 0 | | 0 | |
| 5 - 10 Years Minor | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | 3 | 3 | 3 |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| **7. Education Score** | Not Enrolled | 0 | | 0 | |
| HS Degree / GED | Enrolled in GED | -2 | -4 | -1 | -2 |
| | HS Degree / GED | -4 | | -2 | |
| **8. Drug Program Status** | No DAP Completed | 0 | | 0 | |
| No DAP Completed | NRDAP Complete | -3 | | -1 | |
| | RDAP Complete | -6 | 0 | -2 | 0 |
| | No Need | -9 | | -3 | |
| **9. All Incident Reports (120 months)** | 0 | 0 | | 0 | |
| 1 | 1 | 1 | | 1 | |
| | 2 | 2 | 1 | 2 | 1 |
| | > 2 | 3 | | 3 | |
| **10. Serious Incident Reports (120 months)** | 0 | 0 | | 0 | |
| 1 | 1 | 2 | | 2 | |
| | 2 | 4 | 2 | 4 | 2 |
| | > 2 | 6 | | 6 | |
| **11. Time Since Last Incident Report** | 12+ months or no incidents | 0 | | 0 | |
| 12+ months or no incidents | 7-12 months | 2 | | 1 | |
| | 3-6 months | 4 | 0 | 2 | 0 |
| | <3 | 6 | | 3 | |
| **12. Time Since Last Serious Incident Report** | 12+ months or no incidents | 0 | | 0 | |
| 12+ months or no incidents | 7-12 months | 1 | | 1 | |
| | 3-6 months | 2 | 0 | 2 | 0 |
| | <3 | 3 | | 3 | |
| **13. FRP Refuse** | NO | 0 | | 0 | |
| NO | YES | 1 | 0 | 1 | 0 |
| **14. Programs Completed** | 0 | 0 | | 0 | |
| > 10 | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | -8 | -2 | -4 |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| **15. Work Programs** | 0 Programs | 0 | | 0 | |
| 1 Program | 1 Program | -1 | -1 | -1 | -1 |
| | >1 Program | -2 | | -2 | |
| **Total Score (Sum of Columns)** | | General: | 31 | Violent: | 19 |
| **General/Violent Risk Levels** | | General: | Medium | Violent: | Low |
| **OVERALL MALE PATTERN RISK LEVEL** | | | **Medium** | | |

# Certificate of Completion

### Presented to

**Antoine Harris  Register No. 63414-037**

### For successfully completing the

## Drug Abuse Education Course

*The Drug Abuse Education Course is a minimum of 12 hours.  The goal of this program is to help the offender to make an accurate evaluation of the consequences of his/her alcohol/drug use and consider the need for treatment.*

_S. Rice, DTS_     4/16/2019

**FCC Petersburg-Medium- Institution**



# Certificate of Achievement

Presented to

## Antoine Harris

63414-037

In Recognition of

Addictions Anonymous

12 Weeks

July 10, 2019

R. Gentry, Counselor, FCC Petersburg-Medium, VA



## STRATFORD CAREER INSTITUTE

Mailing/Shipping Address:
1 Champlain Commons, Unit 3, PO Box 1560
St. Albans, VT 05478–5560

Main Office:
8675 Darnley Road, Mount–Royal, QC H4T 1X2
1–800–435–5338

July 23, 2021

Antione Harris
63414–037
Petersburg FCI Low & Medium
PO Box 1000
Petersburg VA
23804–1000

Student Number: G266586

Dear Antione Harris,

Congratulations on the completion of your course!

I am confident that your career options are excellent after seeing your 96% average. You have most certainly put your best effort into this course.

Please find your SCI diploma enclosed. Along with it, I am sending you a copy of your transcript of grades and our "Guide to Winning the Job Search Battle".

Sometime in the future, you may wish to enroll in another SCI program. Now that you are one of our graduates, I would like to take this opportunity to offer you a $100.00 bursary to put towards the tuition of any of our programs which are listed in the enclosed calendar. Please note that the graduate bursary may be combined with SCI's $300 promotional discount, however it cannot be combined with any other offer.

If you would be interested in this bursary, or if I can ever be of service to you, please call me. SCI's toll–free line is 1–800–435–5338. I am available between 8:00am and 4:30pm, from Monday to Thursday, and until 3:30pm on Friday.

Best wishes for success in all your future endeavors.

Sincerely,

Joanne Labre
Registrar

encl



**STRATFORD CAREER INSTITUTE**

Mailing/Shipping Address:
1 Champlain Commons, Unit 3, PO Box 1560
St. Albans, VT 05478–5560

Main Office:
8675 Darnley Road, Mount–Royal, QC H4T 1X2
1–800–435–5338

# *Official Transcript of Grades*

Antione Harris
Petersburg VA 23804–1000

Date: July 23, 2021

Student Number: G266586

Overall Grade: 96%

## Drug & Alcohol Treatment Specialist Program

### Session I

| | | |
|---|---|---|
| DCA1–A | Nature versus Nurture; Human Emotions; Motives for Human Behavior; Defense Mechanisms; Culture; Social Institutions; Social Development; Role of Parents; Social Maladjustment | 100 % |
| DCA1–B | Impacts of Poverty, Alcoholism and Drug Abuse, Domestic Violence, Racism and Discrimination; Social Issues in the Workplace including Absenteeism, Sexual Harassment, and Stress | 100 % |
| DCA1–C | Attributes of a Successful Counseling Relationship; Hidden Dependency; Impacts of Abuse and Victimization; Dual–Diagnosis Clients; Enabling and Co–dependency; Responses to Receiving Help | 100 % |

### Session II

| | | |
|---|---|---|
| DCB2A3 | Introduction to Drugs and Society; Drug Use and Drug Dependence; Origin and Nature of Addiction; Biological, Psychological and Sociological Explanations for Drug Abuse; Vicious Cycle of Addiction; Danger Signals | 94 % |
| DCB2B3 | Drug Use, Regulation, and the Law; Regulation of Drug Advertising; Homeostatic Systems and Drugs; How and Why Drugs Work; Intended and Unintended Effects of Drugs; Drug Interaction; Dependence | 97 % |
| DCB2C3 | CNS Depressants: Sedative–Hypnotics; Pharmacological Effects of Alcohol; Alcohol as a Drug; Physical Effects of Alcohol; Behavioral Effects of Alcohol; Defining Alcoholics; Cultural Influences; Treatment of Alcoholism | 94 % |

### Session III

| | | |
|---|---|---|
| DCB3A3 | Narcotics: Pharmacological Effects; Abuse, Tolerance, Dependence, and Withdrawal; Major and Minor Stimulants; Global Stimulant Abuse; Tobacco Use; Pharmacology of Nicotine; Reasons for Smoking; Motivation to Quit | 100 % |
| DCB3B3 | Hallucinogens; Marijuana; Characteristics of Cannabis; Misperceptions of Marijuana; Behavioral Effects; Therapeutic Use; Dangers of Short–Term and Long–Term Use; Physiological Effects; Inhalants; Treatment and Legislation | 97 % |
| DCB3C3 | Over–the–Counter, Prescription, and Herbal Drugs; Drug Use within Major Subcultures; Drug Abuse Prevention; Risk Factors and Protective Factors; Treating Drug Dependence; Comorbidity | 97 % |

Continued on page 2...



**Session IV**

| | | |
|---|---|---|
| DCB4A1 | Substance Abuse Counseling for the 21st Century; Drugs and Their Effects; Physiological Functioning and Psychological Characteristics of the User; Sociocultural Environment; Drug–Classification Systems; Motivational Interviewing | 92 % |
| DCB4B1 | Assessment and Treatment Planning; Helping Clients Change; Empowering Clients Through Group Work; Maintaining Change in Substance Use Behaviors | 92 % |
| DCB4C1 | Working with Families; Substance Abuse and the Family System; Stages in Family Recovery; Program Planning and Evaluation; Preventing Substance Abuse; The Concept, General Model, and Purpose of Prevention | 88 % |

\* \*   End of Transcript   \* \*





Overall Grade: 96 %
An average overall grade of 70% is required to successfully complete this program.

Average clock hours: 240

Date of Graduation: July 13, 2021



Registrar

*Seal of Authenticity*

# Stratford Career Institute

Mount–Royal, QC

This is to certify that

## *Antione Harris*

*has completed a course of studies in*

## Drug & Alcohol Treatment Specialist

*and, in testimony whereof this*

# DIPLOMA

### with highest honors

*is awarded*

*In witness whereof we have hereto subscribed our names and affixed
the academic seal of the school on this 13th of July 2021*

Executive Director

Registrar

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

     v.                CRIMINAL CASE NO.
                        ELH-17-322

ANTOINE HARRIS,

     Defendant
_____/


(Sentencing)
Monday, December 17, 2018
Baltimore, Maryland


Before:  Honorable Ellen L. Hollander, Judge


Appearances:

    On Behalf of the Government:
    Michael C. Hanlon, Esquire

    On Behalf of the Defendant:
    Michael D. DeMartin, Esquire

    Also Present:
    Nicole Wonneman, Probation Officer


---------------------------------------------------------------

Mary M. Zajac, RPR, FCRR
Fourth Floor, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

1      (Proceedings at 12:14 p.m.)

2      MR. HANLON:  Your Honor, I'd call United States versus

3  Antoine Harris, Criminal Case Number ELH-17-0322.  This matter's

4  set for sentencing.  Michael Hanlon for the United States.

5      THE COURT:  All right.  Counsel?

6      MR. DEMARTIN:  Good afternoon, Your Honor.  Michael

7  DeMartin, appointed counsel for Mr. Antoine Harris.

8      THE COURT:  And, counsel, just preliminarily, are you

9  satisfied that your client is both mentally and physically able

10  to proceed to sentencing?

11      MR. DEMARTIN:  I am, Your Honor.  I had the opportunity

12  to visit with him in the marshal's lockup prior to the hearing

13  and he is ready to go.

14      THE COURT:  All right.  Also, can you assure me that he

15  has either read for himself or you have read to him the content

16  of the Presentence Report?

17      MR. DEMARTIN:  Yes, Your Honor, as well as the revised

18  Presentence Report and the corrections thereto.  And we are

19  satisfied with those corrections and the status of the PSR at

20  this point.

21      THE COURT:  All right.  Thank you.  You may have a

22  seat.  And we are here for sentencing.  It is in connection with

23  the defendant's plea of guilty to Count One of a second

24  superseding indictment charging conspiracy to distribute

25  narcotics, in violation of 21 USC Section 846 and 841(b)(1)(A),

1  which is a Class A felony.

2      In preparation for the sentencing, the Court has read

3  the revised Presentence Report, docketed at ECF 255.  I read as

4  well the defense sentencing memorandum at ECF 278.  And there are

5  several exhibits, quite a number of very moving letters of

6  support, which were supplemented on Friday, at ECF 302.  And I

7  also read the government's sentencing memorandum of December 12.

8  And that's at ECF 300.  And the government also provided an

9  exhibit.

10      I wanted to explain to the defendant and to the people

11  who are here in his behalf that there are quite a number of cases

12  in the United States Supreme Court and the United States Court of

13  Appeals for the Fourth Circuit that make clear that it is the

14  Court's responsibility to calculate, and hopefully to calculate

15  correctly, the applicable sentencing guideline range for the

16  case.  This guideline range, once calculated, is merely advisory,

17  not mandatory.

18      But the case law does describe the sentencing guideline

19  range as the starting point, or the initial benchmark, in the

20  Court's overarching effort to arrive at a sentence that is

21  sufficient, but not greater than necessary.  Of course, that test

22  is quite easy to assert and difficult to apply.

23      And in every case the Court must make an individualized

24  assessment both of the offense and the offender, taking into

25  account all of the factors in Title 18 of the United States Code

1    at Section 3553(a).  So I hope that background is useful.

2              There are, as I understand it, disputes about the

3    calculation of the guidelines.  So it will be the Court's

4    responsibility to resolve these disputes.  As I understand it,

5    one dispute concerns the question of whether the defendant

6    maintained a premises for the purpose of manufacturing or

7    distributing a controlled substance.  And if he did, it would be

8    a two-level increase to his offense level under 2D1.1(b)(12) of

9    the guidelines.

10             Another issue is whether he was an organizer or leader

11   of a criminal activity that involved five or more participants.

12   If so, four levels would be added under 3B1.1A.  And these issues

13   were reserved for resolution by the Court.

14             There's no determination that he is a career offender.

15   So while that issue had been reserved, there is no dispute.  He

16   is not deemed a career offender in the Presentence Report.

17             The Presentence Report does calculate based on these

18   two other enhancements.

19             So counsel, may I see you at the bench, and we can talk

20   about the order in which you'd like to present these matters?

21   And I'll ask that the defendant get a headset.

22             Conference at the bench.

23   (It is the policy of this court that every guilty plea and

24   sentencing proceeding include a bench conference concerning

25   whether the defendant is or is not cooperating.)

1          THE COURT:  So I think after discussion with counsel,

2     there are the two enhancements I mentioned, which would add a

3     total of six levels to the offense level.  This ruling of mine

4     has no bearing on any other case.  But I think in the context of

5     this case, the issues of the enhancements are better addressed in

6     the context of 3553(a).  And so the Court is not going to apply

7     the enhancements and will just consider any arguments about them

8     in the context of addressing the factors under 3553(a), without

9     prejudice to the right of the government to make arguments about

10    these enhancements in other cases.

11          And that means that before any deductions for

12    acceptance of responsibility, the defendant would start out with

13    an offense level of 32.  He earns two deductions under 3E1.1(a)

14    for his acceptance of responsibility.  In addition, he would be

15    eligible for one more deduction under 3E1.1(b) for his timely

16    notification of his intention to plead guilty.  Does the

17    government so move?

18          MR. HANLON:  The government so moves, Your Honor.

19          THE COURT:  That leads to me granting the motion and a

20    total of three deductions.  So the final offense level would be a

21    29.

22          And the defendant has a total of six criminal history

23    points, but he earns an additional two points because he was

24    under a criminal justice sentence when this offense occurred.

25    That's a total of eight points.  And eight points yields a

1  criminal history category of IV.

2         So an offense level of 29 and a criminal history

3  category of IV leads to a guidelines range of 121 to 151 months.

4         Did I make any mistakes, counsel?

5         MR. HANLON:  Not from the government's point of view,

6  Your Honor.

7         MR. DEMARTIN:  No.  We agree with the calculations,

8  Your Honor.

9         THE COURT:  All right.  And then, counsel, anything

10 else with the guideline calculations before we move to the

11 3553(a) analysis?

12        MR. HANLON:  No, Your Honor.

13        THE COURT:  And from you, Mr. DeMartin, any objection?

14        MR. DEMARTIN:  No, ma'am.

15        THE COURT:  Okay.  Then let me turn to the government

16 first.

17        MR. HANLON:  Thank you, Your Honor.  So I don't want to

18 repeat what I said in my sentencing memo, Your Honor.  But I do

19 think that there's, I do think I need to summarize and I want the

20 record to be clear and I want to be sure that I'm being clear as

21 to how the government's arrived at this recommendation in this

22 case.

23        The government does believe that a 12-year sentence is

24 appropriate in this case.  The government has looked at this case

25 both kind of generally in terms of the impact that this kind of

1    drug trafficking has on our community, particularly fentanyl and

2    heroin, and how they're contributing to the opioid problem.  The

3    government's also looked at sort of individual facts in this case

4    and the defendant's role.  And both of those considerations, Your

5    Honor, lead the government to believe that when you look at the

6    type of drug we're dealing with, the quantity of the drug we're

7    dealing with, the duration of the conduct that we're dealing

8    with, and the defendant's particular role, 12 years is an

9    appropriate sentence.  And that's before you get to the

10   defendant's criminal record, which I will address.

11           Again, without harping on everything in the brief

12   because I'm sure the Court's read it, the case was marked not

13   only by the fact that it involved a lot of fentanyl being brought

14   into this country from a foreign country -- the defendant was not

15   involved in the international smuggling operation, Your Honor,

16   but he was buying directly from the person who was.  So we're

17   talking about sort of a first level receiver/distributor of

18   fentanyl straight into the United States from a foreign supplier.

19   So this is significant conduct.

20           And I don't think I need to tell the Court about the

21   impact that this type of drug is having on this community.

22           Now, there's been debate, and I think the defendant

23   reserved the right to argue that he didn't know it was fentanyl,

24   he thought it was something else.  It doesn't matter.  This was

25   opioid trafficking, Your Honor.  This was, even by the defense,

1    it was heroin trafficking.  This is significant conduct.

2         And the kilogram of fentanyl that was taken out of the

3    defendant's wife's house, sort of the end of his involvement in

4    the conspiracy in April of 2017, Your Honor, that kilogram of

5    fentanyl had hit the streets, it would have created a public

6    safety problem, Your Honor.  I think there's a good chance it

7    would have resulted in overdoses.  People might have died.  So

8    that is the significance of just the general conduct.

9         A key point, Your Honor, though, I think is the

10   defendant's own particular role.  And whether or not this is a

11   basis for a supervisory enhancement or a guidelines enhancement

12   or not, it is very a significant 3553(a) consideration.

13        I laid out in the government's brief, there were at

14   least four components, as I consider it, to the manner in which

15   the defendant was operating as a leader in this activity.

16        First of all, he was supervising, he was organizing, he

17   was coordinating all of the activity at this sort of Fox Street

18   stash location.  And I provided some samples of calls.

19        It was the defendant who was providing the supply.  It

20   was the defendant who was sort of initiating the conduct.  It was

21   the defendant who's giving instructions to person, to people

22   about getting this type of bags and make sure Jahod has what he

23   needs, and give so and so two, and so forth.

24        So the activity at the 2808 Fox Street location was

25   largely precipitated by the defendant's conduct.  He not only was

the one who was providing the supply, but he was really
coordinating and directing operations. And I think you've seen
that in the calls.

The defendant also, Your Honor, had supervisory
responsibility. And this is related, I guess, to the stash house
location, Your Honor. But this January 17th, 2017 call with
person known as Twizzle. It's a second aspect of the defendant's
sort of role in this case, which I think is significant. It is a
single call, Your Honor, but it's a lengthy one. And it tells us
not only about the type of business that this was, but also I
think about the defendant's role in the business.

You've seen the transcript, Your Honor. You've seen
the excerpts of it. It is perfectly clear that the defendant is
receiving information from a person who has a subordinate
position to him. Something's happened, something has gone wrong.
And they're relaying the information up the chain of command.

The defendant, on a couple of occasions, seems
irritated, why can't someone else handle this. But it's clear he
needs to know, he needs to be told. And, frankly, Your Honor,
it's very obvious that he's being told because he is the person
in charge. He's the one who has to be told when something goes
wrong.

Of course, Your Honor, the nature, what he is being
told is that somebody didn't make it because of the mix. And
you've seen the government's reading of that, Your Honor. The

1    government submits that it's very clear what this call meant.

2         At a minimum, this signals to the defendant, which the

3    government respectfully submits he would have known, anyway, that

4    this is a deadly business that he is in, and he and his

5    codefendants were in a business where sometimes people didn't

6    make it because of their mix.  So that call's important for two

7    reasons.

8         A third aspect of the defendant's supervisory role,

9    Your Honor, is his supervision with respect to Lisa Harris.

10   You've seen the call there.  You're familiar with Lisa Harris's

11   case, Your Honor.  This is certainly a situation in which this

12   individual with virtually no criminal record is being put into

13   this thing, and they're operating essentially under the

14   defendant's control.

15        I also think it's significant, Your Honor, in terms of

16   the role of the offense and the seriousness and the nature of the

17   conduct that this last kilogram of fentanyl hits Baltimore in

18   April of 2017.  The defendant is at Lisa Harris's residence to

19   receive it from Tavon Jones.  You've seen the facts in the agreed

20   statement.  But the kilogram doesn't go with him.  The kilogram

21   stays in his estranged wife's house, where he goes to another

22   location.  This is typical, again, Your Honor, this distancing.

23   He's sometimes at Fox Street, but he's not always there.

24        He distances himself from the kilogram.  He's directing

25   someone else to do deals for him.  This is supervisory conduct.

1    And I'll end on that subject, Your Honor, with the

2    issue of the New York trip, a situation in which the defendant,

3    Mr. Harris, is in contact with a New York supplier. Someone is

4    an alternative supplier when Tavon Jones isn't around. He wants

5    to set up a deal. So what does he do? He sends a member of his

6    family along with Jahod Brandon, another coconspirator, to do the

7    deal for him. This is pure supervision. This is a leadership

8    kind of role. At the 3553(a) level, Your Honor, I think it's

9    important that that be taken into consideration.

10    I'll touch briefly, Your Honor, on the question of the

11    stash house issue, but I've already touched on it. It's clear

12    that this residence at 2808 Fox Street was also being used in

13    furtherance of a conspiracy. And whether or not it's a

14    guidelines issue or a 3553(a) issue, that goes hand in hand with

15    the defendant's supervisory conduct, and it goes hand in hand

16    with the nature of the seriousness of this business.

17    This is almost like a drug distribution point being run

18    out of this house. It's a pure stash house operation being run

19    as part of an organization, a crew, a wing of this conspiracy

20    that the defendant was the leader of based on him having access

21    to the supply and based on his phone calls.

22    Now, he was not the only leader in this conspiracy.

23    The Court will eventually hear about the other lead defendant in

24    this case. And I imagine I'll be making arguments that are

25    similar to these when I get to that person.

1       It has always been the government's position, Your

2   Honor, that this was a case of two defendants in a partnership,

3   one with the supply connection in Mexico, the other one receiving

4   the supply and distributing it, both leaders within their wings,

5   enjoying a business relationship.  And, ultimately, the

6   government will take the position that enhancements are proper

7   for both, or that the 3553(a) factors require that that

8   leadership conduct be taken into consideration.

9       So we're dealing with a defendant with a significant,

10  substantive, substantial organizational role involving a lot of

11  what is probably the most dangerous drug in America today,

12  supplying a lot of it, and calls and communications indicating

13  that he's aware of the risk that this type of product can have on

14  people.  He's directing the activities and the distribution of

15  this drug.  And he's sort of the first-level distributor/supplier

16  from an individual who's getting it straight from Mexico.

17      And this is over an extended duration of time.  This

18  was not just a couple of episodes.  This was a months-long

19  conspiracy.  And the defendant's wiretap was running for just

20  about the entirety of it.  This is a very large case and a very

21  significant role.

22      On top of all that, Your Honor, is the defendant's

23  criminal record.  The defendant has a number of prior significant

24  convictions.  This is not a minor criminal record whatsoever.

25      In form -- excuse me.  In function, if not in form, the

1  defendant satisfies the requirements of a career offender
2  adjustment.  To the extent he's not a career offender, Your
3  Honor, the government hasn't really pushed for it partly because
4  of the moving aspects of this law, of the law in the area, and
5  partly because I don't think this case needs to be decided on
6  that.  The government hasn't pressed for career offender.

7          But when you look at the function, at the substance of
8  the defendant's crime here and his criminal record, there is no
9  difference between the defendant and a true, genuine career
10  offender.  We have previous violence.  We have previous drug
11  trafficking.  We have a not great adjustment to judicial
12  supervision.  And, of course, this crime is committed while the
13  defendant is on supervision for a prior felony offense.  The
14  totality of this crime takes place while the defendant was
15  already serving a sentence.

16          All of this, Your Honor, are significant factors that
17  weigh heavily in favor of a 12-year sentence.  That sentence
18  reflects the seriousness of the offense.  It reflects the
19  defendant's history and characteristics, his criminal record.  It
20  sends what I think is an absolutely necessary message of
21  deterrence.  It sends a message to the community that they can be
22  protected from this kind of repeat, ongoing fentanyl dealing.
23  And I do think, Your Honor, that it is proportional to the
24  sentences that the government has sought or will seek in other
25  cases.

1          So far, Your Honor, the Court has imposed sentences of,

2    in the five, six, seven year range for some of the other

3    defendants.   There are two defendants that have received I think

4    higher sentences than that range.

5          Michael Johnson received -- I may get this wrong, Your

6    Honor -- I think was a nine-year sentence.  This was an

7    individual who was in the Tavon Jones wing of the conspiracy.

8    Did not have a leadership role.  I cannot remember Mr. Johnson's

9    criminal record, Your Honor, so I --

10          THE COURT:  I have down in my notes he got 102 months.

11          MR. HANLON:  I apologize, Your Honor.  So that's eight

12    and a half years.  So I stand corrected.

13          THE COURT:  Maybe I wrote it down wrong.

14          MR. HANLON:  No, Your Honor.  I'm sure that the Court's

15    correct.  And then another individual, Thomas Merrick, received,

16    it was in the 130s, Your Honor, if memory serves.  I think it was

17    11 years.

18          THE COURT:  138 months.

19          MR. HANLON:  Yes.  So, again, less than Mr. Harris,

20    than what the government's asking for for Mr. Harris.

21          To be very clear, I don't want to understate Mr.

22    Merrick's role, Your Honor.  He had a significant criminal

23    history and he also had a substantive role.  But he was nothing

24    like a supervisor.  And I think I made very, very clear during my

25    argument in Mr. Merrick's case that he had nothing even

1  approaching a supervisory role.  So we're talking about a very

2  differently situated defendant with Mr. Merrick.

3          Twelve years, Your Honor, is an appropriate and

4  proportional sentence for Mr. Harris, and that is the

5  government's recommendation.

6          THE COURT:  Thank you, counsel.  And Mr. DeMartin.

7          MR. DEMARTIN:  Your Honor, I submit that the government

8  overstates Mr. Harris's role in this offense.  He's certainly not

9  a wing of this offense, an equal with the importation of

10 multiple, multiple kilos.  The government doesn't show or allege

11 that he's the exclusive middleman for this large importation

12 wing, as the government would call it.

13         Mr. Harris is simply a broker, a middleman.  He didn't,

14 he didn't get a regular supply unless he had some buyer ready,

15 willing and able.  He didn't make that much money doing this.  He

16 got these drugs fronted from, from Tavon Jones.

17         Certainly nowhere near the scale of his codefendants.

18 I think that's what the Court, I would ask the Court to look at.

19         Most significant in this case are the sentences of the

20 codefendants.  Again, we have Corey Riley, who I'm astounded that

21 the government can ask for more time for my client than Mr.

22 Riley, that they think is appropriate.  Certainly, he's

23 affiliated or associated with 3.4 kilos of fentanyl at least, a

24 massive cash stash of $61,000, a firearm.  He fled to Mexico.  He

25 also faced two violations of supervised release.  And he

1    definitely got an early Christmas present whenever that

2    sentence -- of 78 months.  Certainly, extremely, extremely larger

3    in the scale of things than my client, Mr. Harris.

4         Another person who is critical to the importation of 31

5    kilos of fentanyl and 10 kilos of heroin, who received 80 months,

6    was Mr. Brown, Perry Brown.  He made multiple trips to Mexico.

7    Also associated with firearms.

8         And, again, in reading through their statement of

9    facts, and not that this is at issue, but it is in respect to the

10   3553(a), 3553(a) factors, there was a premise issue.  There was a

11   storage location rented by these gentlemen specifically for the

12   purpose of storage of drugs, and there was no enhancement asked

13   by the government for that.  Certainly, that would have

14   qualified, the fact that they rented a storage facility to have

15   their drugs stored exclusively for that purpose.  Government

16   didn't ask for it there.  Again, Mr. Brown had 80 months.

17        Mr. Johnson, also responsible for the storage unit, no

18   enhancement requested.  He traveled to Mexico also numerous

19   times.  At least three kilos of heroin reasonably foreseeable.

20        All these gentlemen were multiple, multiple kilo

21   dealers and receiving, in essence, far less than the range for

22   Mr. Harris.

23        Certainly, 3553(a)(6) requires the Court to address

24   sentencing disparities and put these folks in relative

25   culpability with regard to their sentences.  I'm not sure why Mr.

1  Merrick got 138 months.  That seems excessive.  I wasn't privy to

2  all the facts of his sentencing.

3          And, again, it certainly, we would submit that it's

4  certainly not the case that he was an equal partner with the

5  importers.  He was a small broker, middleman.  He got caught with

6  the biggest amount at that house at that time.

7          Other than that, the government has evidence of an

8  ounce here and an ounce there.  That's it.  He wasn't the

9  pipeline for the importers to the street.

10         So, certainly, that justifies a much lower sentence

11 than the importers got.  And with eight years as our floor, I

12 believe that more than, more than justifies the eight-year

13 sentence, Your Honor.

14         With regard to his health, he has many health issues.

15 He suffers from anxiety, depression.  All these have been

16 diagnosed in the past.  He's taken Zoloft, Seroquel, Prozac.

17 Suffers from high blood pressure, diabetes, arthritis.  He's had

18 tumors in his cheek and his bladder surgically removed in the

19 past.

20         He'll be at a disadvantage, I would submit, once he

21 goes to federal incarceration.

22         He's blind in his right eye.  There's no chance,

23 really, for that to get corrected until he's released.

24         Suffered two strikes by a car as a child when he was

25 age 5 and 10.  He crushed his ankle.  He's got limited mobility.

1    He also has strong family support, Your Honor.  He has

2  numerous family members in the gallery.  We submitted numerous

3  moving letters to the Court.  In addition, we supplemented those

4  on Friday.

5    I read through all those.  And certainly moving and

6  show that there's the part of him that is the drug dealer on the

7  street.  He acknowledges that.  He's taken responsibility for

8  that.  There is the other person who is certainly a family man.

9  And those letters attest to the fact that he loves his family,

10  they love him back.  And they're still involved in his life and

11  will be.

12    With that, I'll defer if the Court wants to hear

13  allocution.

14    THE COURT:  All right.  Well, let me advise you, sir.

15  You have the absolute right to address the Court in your own

16  behalf if you would like to.  You're not required to say

17  anything.  If you chose not to say anything, I would not hold it

18  against you.  But if you do wish to say something, now would be

19  the time.  Anything you'd like to say, sir?

20    THE DEFENDANT:  Yes, ma'am.  If the Court, you just

21  bear with me for a second.

22    THE COURT:  Sure.

23    THE DEFENDANT:  I'm a little nervous.  I have to take a

24  few deep breaths here.

25    Actually, I was prepared November 30th for sentencing

1    and I have a letter for you, and I have a copy for myself and a

2    copy for you.

3              THE COURT:  Okay.

4              THE DEFENDANT:  If the bailiff or somebody want to give

5    it to you.  I also have another letter of a program that I've

6    been involved in.  Here's another one.  Thinking For Change

7    program I've been involved in.  And I would have liked to finish

8    this program.  It was just brought to my attention since I've

9    been at CDF.  And I did join.  I found some pretty good use of

10   it.

11             Judge, if I may read this letter.

12             THE COURT:  Sure.

13             THE DEFENDANT:  Okay.  First and foremost, I want to

14   apologize to the Court and to my family, the public, Mr. Hanlon,

15   because I do know how serious charges like these are.  At my age,

16   I should have known better.  So I don't pretty much disapprove of

17   what Mr. Hanlon has said, his thoughts, NS I respect his wishes.

18             However, I would like to read this letter.  It pretty

19   much will explain it all.

20             THE COURT:  Okay.

21             THE DEFENDANT:  Represent how I feel.

22             It says:  I'm writing this letter in hope that it finds

23   you well and in good spirits.  As you know, I'm to be sentenced

24   before you on November 30 of 2018.

25             Since being incarcerated, I've had a long time to

reflect on what I've done wrong and how it affected others.  I

plan to learn from my mistakes and become a full, productive

member of society upon my release.

Born and raised in Baltimore City, the ghettos was full

of drugs and violence.  Sadly, but because I lived there, one

comes to be very familiar and accustomed to that way of life.

That doesn't suggest that all individuals who have lived there

are persuaded by that way of life.  I'm one of many who has been.

This way of life attributed to drug use, drug abuse, death or

imprisonment, one way or another.

As a youth, I explored other alternatives like boxing

and Pop Warner, football and baseball.

My parents instilled good morals and principles in me.

Respect, discipline was first and foremost.  I was also taught to

believe in God as well.

My mom kept a clean home and cooked nice meals while my

dad worked five days a week, and sometimes overtime on the

weekends.  However, as time went on, I discovered that my parents

were also a part of the way of life.  They were functional drug

users.  We were barely surviving.  Then, of course, their drug

use became drug abuse.

My brother and I maintained as best we could.  We took

on paper routes, cutting grass, shoveling snow, helping people

carry their groceries to their cars or their homes, anything

legal we could do to earn some money.

1    As we became teenagers, my brother was quickly swept up

2    by the hood.  At age 13, he took to the streets and never

3    returned.  I did the very best I could to maintain, but at age 17

4    I was in school and working a Baltimore Sun newspaper route and

5    making good money when my district manager moved to Washington,

6    DC.  His move left me jobless.

7    I soon took to the very streets I tried to avoid

8    because my first daughter would be born.  By the age of 19, I was

9    being sentenced to 25 years in prison.  That would be my very

10    first and only incarceration.

11    Upon my release 14 years later, I was married and with

12    a family of four.  After being released for only 60 days, my best

13    friend was shot and killed.  Having witnessed his murder, I was

14    charged.  That completely devastated me.  When he died, a part of

15    me died as well.  He was a true friend.  He was like a brother to

16    me.  He cared and loved me for me.  I've yet to experience that

17    kind of friendship to this date.

18    Although we were cleared of any wrongdoing, I suffered

19    later depression and seek the help of a psychiatrist.

20    THE COURT:  And who's the "we" were cleared?  You said

21    "we were charged."

22    THE DEFENDANT:  Yes.  Me and another person was

23    charged, Your Honor.  I had just met the person, actually.  Upon

24    my release, I also struggled with a challenge to lead my family.

25    We lived in the ghetto.  All my daughters stayed in constant

brawls over nonsense.  Eventually, I found a construction job and
we managed to move to Baltimore County.  The environment was
safer and allowed my children to focus and finish high school.

My parents ultimately divorced before I was home off
the 25-year sentence.  However, they both stopped using drugs for
over 20 years now.  They both overcame their addictions and
retired as productive members of society.

For years I spent a great deal of raising teenagers and
grandchildren.  Then in 2008, I received a phone call at my home
from my mom.  She informed me that my brother had died.  He died
after the use of opiates.  His death left me weeping in sorrow.
I cried every day at the funeral and then on.  His death added to
more depression.

My life experiences inspired me to express to what I've
always known to be wrong.  My parents' drug use, together with
peer pressure and ghetto violence, appeared to be the normal, the
way of life.  When people use heroin, cocaine, crack, and
especially marijuana, I didn't care.  I've seen it all my life.
One side of me knew it was wrong but the other side of me knew
the aspect of recreational use and the dependency for the ones
that are sick or rely on the drugs for money.

I myself abused marijuana prior to this arrest.  All I
was concerned about was smoking weed and making money to make my
life easier to cope with.  I became addicted to marijuana and
provided everything I and my family needed.  So it has a reverse

psychological effect on the choice of right and wrong.  You know

it's wrong, but your mind makes all kinds of excuses that make it

right.  But it's all a lie.

The marijuana I smoked every day suppressed the truth.

It covered up what the outline -- it covered up what outlined the

murder of my best friend.  It covered up what substance abuse

does to families.  It covered up how many people lost their lives

to overdoses, including not just my brother, but I lost a cousin

in 1990, an uncle a few years back, and an older cousin since

I've been here.

Since I've been here, I've reflected on all these

issues mentioned, and I can remember all the mixed emotions.  I

was sad, hurt and embarrassed when substance abuse ripped through

my home as a youth.  I was devastated and fell into depression

when my best friend was murdered.  I was uncontrollably heavy in

deep sorrow over my brother and other family members' death as a

result of drugs.

And last but not least, I was and I still feel the hurt

and pain of what I and my addiction to marijuana has done to

myself.  I psyche myself out.

Moreover, past experiences are supposed to serve as

examples.  In light of that, I fail to be a part of the heroin

epidemic in a positive way.  Those children who parents are

proud, who parents proud of them because of drug abuse was me.

That person whose family that lost their friend or loved ones to

1   violence due to drugs was me. That person whose family that lost

2   their loved one to drug overdoses was me. That person who was

3   using drugs to suppress right from wrong was me. And that person

4   whom told himself he was doing the right thing in support of drug

5   use and making money was me.

6   No one is to be held accountable but Antoine Harris.

7   Not the government, not the lawyers, or my parents. I no longer

8   choose to be a part of the problem, but a part of the solution.

9   I am deeply sorry for what I've done and how it

10  affected others. I plan to turn this negative into a positive.

11  I plan to enroll myself in self-help substance abuse programming

12  that assists with addiction to drug use and drug dealing. I plan

13  to help others identify their problems and solutions.

14  I pray that God forgive me for all my sins every day,

15  that God help me maintain a positive attitude and motivation to

16  help others.

17  I am very sorry for the events that has gotten me to

18  this point. I am truly sorry for the negative effects on others.

19  I apologize to my family, to the public, to the government, to my

20  attorney, and to you, Your Honor, for being a part of the problem

21  with the war against drugs.

22  I choose to become a full productive member of society.

23  And I look up and live out the rest of my life with my family and

24  helping others.

25  I accept full responsibility. I accept full

responsibility, Your Honor.  And I also ask for leniency, Your

Honor.

I would like to thank you, Your Honor, very much for

your time and consideration with this matter of sentencing.  And

at this time I denounce all drugs and all criminal activities.

THE COURT:  Well, what an impressive letter, Mr.

Harris.  And thank you for taking the time to write it.  And I

assume you wrote it on your own.  I know there are so-called

jailhouse lawyers in every penal institution, but I'm crediting

you with this letter, and also the other one that you handed up

that I had a chance to scan.

I'm struck by the fact that you had so much potential.

How do we get somebody like you to make better choices?  To take

a life and waste it.  And you have plenty of time left, I hope.

So going forward, you've demonstrated your capacity to be a very

thoughtful, reflective, and important and contributing member of

our community.  There isn't any reason I can think of why someone

who has the ability to write such a letter couldn't choose a

better path.  And I hope you put your money where your mouth is

and that, in fact, you really mean it.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And you can have a seat because I do have a

few things I wish to say.

After conferring with counsel, it appeared it was not

necessary for me to resolve any disputes in the guideline

1  calculations, and I didn't.  But at least in the 3553(a)

2  analysis, it does seem, I read the transcript, the transcript

3  that was provided.  I've certainly considered your lawyer's

4  argument as to, for example, the enhancement for the stash house

5  and the enhancement for being a leader.

6          It did seem to me from reading the agreed-upon

7  statement of facts that were part of the plea agreement and the

8  transcript than was provided that -- I'm not saying that you were

9  the top of the pyramid, but I do think it seems from the

10  stipulated facts and the content of the wire transcript that was

11  given to me that you did have an important leadership role in

12  this enterprise.

13          I understand the defense's arguments about maintaining

14  the stash house.  I think that's a trickier question, actually.

15  The defense takes the position that you didn't have a possessory

16  interest and you didn't personally operate or manage the Fox

17  Street location.  If I had to rule, I would give you the benefit

18  of the doubt on that one.  The defense position, at least

19  according to the government, ignores the instances in which you

20  were involved in operations at Fox Street.  But I think if I were

21  required to rule, I would most likely not have awarded that

22  enhancement.  I just want to make that point to the extent

23  someone thinks it's relevant under 3553(a).

24          I would reach a different conclusion on your role in

25  the offense.

1          I did want to explain to you and to your supporters,

2     Mr. Harris, some of the factors that Congress tells the judges

3     they should take into account in the effort to arrive at a

4     sentence that is sufficient, but not greater than necessary.  And

5     as I said, the test is so easy to articulate and so difficult to

6     apply because people are complicated, because decent people make

7     poor choices, because decent people sadly sometimes do violate

8     the law in a very serious way.  And this obviously is a serious

9     offense.

10          I mentioned at the outset that the guidelines

11    themselves are merely advisory.  That means the Court may never

12    presume the appropriate sentence is necessarily one that falls

13    within the guideline range, even though other cases describe it

14    as the starting point.

15          Congress tells the judges they should consider the need

16    for the sentence to reflect the seriousness of the offense and to

17    provide just punishment.  Well, I think the government did a very

18    good job of describing the serious nature of this offense, both

19    by drug quantity and by the nature of the drugs.  And I know your

20    argument is that you didn't know it was fentanyl.  But the

21    government counters with it doesn't matter really, at the end of

22    the day, because you are in the business where it seems to me

23    that can happen.  And that's a risk, and a known risk.  And,

24    indeed, I think the conversation that was caught on the wire with

25    Twizzle reflects that.

1        So we can look around our community and we see the

2   devastation that the drugs of this type are causing.  It's

3   really, frankly, indescribably how many lives are lost either

4   literally or figuratively, how many families suffer from loved

5   ones who are involved in drugs.

6        And then though there's no accusation of violence on

7   your part, we all know, unless we're hiding under a rock, that

8   drug trafficking is associated with violence.  So it's

9   understandable when Congress says that the judge should consider

10  the need for the sentence to reflect the seriousness of the

11  offense and to provide just punishment, the government's argument

12  would I think be consistent with that factor.

13       Another goal that Congress or factor that Congress says

14  the judges should consider is the need for the sentence to deter

15  others from such criminal conduct.  Well, we can debate that.  We

16  know deterrence isn't perfect.  Far too many people are not

17  deterred.  But we don't see the people who are deterred.  And I

18  continue to believe deterrence is a legitimate component of

19  sentencing.

20       Yet another objective is to protect the public from

21  further crimes of the defendant.  Only you know the answer to

22  this one, Mr. Harris.  You've I think reached a point in your

23  life that maybe we could say is a turning point.  You're now I

24  believe 47 years of age.  You're not a youngster, but I hope you

25  have still many years to go.  And if you mean what you say, this

1     wouldn't be a concern.  Of course, how could I know?

2             And then another objective is to rehabilitate the

3     defendant in the most effective manner.  However, no sentence can

4     be extended for the sake of rehabilitation.

5             I want to comment on your very eloquent letter and also

6     from the material that was previously provided.  And I say none

7     of this to embarrass you.  But it does resonate and I think it's

8     important to note.

9             As I said, you're now 47 years of age.  You've shown

10    your intelligence by writing such a powerful letter.  I believe

11    you indeed do have some college in your background.

12            You're the father of five, from three relationships.

13    You talk about this in your letter that you just submitted to me

14    but, also, previously it was brought to my attention, the loss of

15    your own brother, I believe to a drug overdose.  I don't know

16    that I knew about your involvement as a witness to a murder, so

17    I'm sure that that was dreadful and painful.

18            You seem to have had caring parents.  On the other

19    hand, they had their issues.  And they were caught up in drug use

20    as well.

21            I can't sugarcoat your role in this very serious drug

22    trafficking organization and I can't sugarcoat the danger of the

23    drugs, fentanyl and heroin.

24            I mentioned the call between Harris and Twizzle that

25    was provided to me as an exhibit.  It took place in January of

1    2017.  And I think you were alerted there to the fact that you
2    were in a business in which sometimes customers don't make it,
3    because that's what was said.

4           I also note -- and none of this is meant to embarrass
5    you, as I said -- you do have a history of both physical and
6    mental health issues.  And they are not lost on me, either.

7           Both sides have done a very effective job in arguing
8    for their respective positions.

9           And I wanted to comment on the one thing I didn't
10   mention, the government did mention it, and that's your prior
11   record.   There is no determination that you're a career offender,
12   and the government makes the argument that it didn't press the
13   matter, but the record speaks for itself, essentially.  I know
14   that by points your record is not as serious as some we see.
15   There's a range of criminal history categories of I to VI, and
16   you came out at VI, so you're in the low end of the top half, if
17   you will, VI being the worse.

18          But in your criminal history, you were only 19, and
19   your lawyer, I know, would suggest this was so long ago, but part
20   of the reason it was so long ago is because you were incarcerated
21   for such a long time, and you say it was your only incarceration
22   but you were involved in a conspiracy with two other people to
23   commit a premeditated murder of someone named Derek Brown.   And
24   in that case the Court gave you a sentence, it looks like, it
25   says 25 years.  I don't know if that was a straight 25 years and

1    then you served 14 or 15 of it.

2           You were paroled -- you got that sentence in 1991. The

3    offense was December of 1990. You were 19. And you were paroled

4    in June of 2004. And, obviously, at 19, that's a pretty serious

5    sentence. That's one of the things that I think does cause the

6    Court some concern.

7           The rest of your offenses. Paragraph 39 didn't even

8    score any points, although it was a felony drug distribution.

9    And you only got three days of incarceration. And then

10   Paragraphs 40 and 41 are rather de minimis. And then you have a

11   felony drug conviction referenced in Paragraph 42. You got 10

12   years, but 9 years 8 months and 20 days were suspended, meaning,

13   looks like time served.

14          So you're right when you say you had only one period of

15   incarceration, of any significance, anyway. But that's a serious

16   record. And I'm sure with that record it's difficult to get a

17   job.

18          So I think -- and I am not trying to be Solomonic in

19   any way, it may come out that way by appearance, but I'm not --

20   I've given a lot of thought to this case. But I have to say that

21   as much thought as I gave to it prior to coming on the bench,

22   your powerful letter is quite a significant statement of your

23   potential and of your remorse. And I can only hope it's not just

24   for sort of the effort to obtain leniency from the Court. I

25   can't know the answer to that really.

1    But I would ask that you please stand.

2    I'm mindful of the two sentencing recommendations.  I

3    think each lawyer, as I said, has done a very effective job in

4    advocating for his respective position.  And my view, and maybe

5    there's that component of the season, Mr. Harris, but I am going

6    to impose a sentence of 9 and a half years, which I think is very

7    generous.  And I believe that's 114 months.

8    MR. HANLON:  I believe so, Your Honor.  Yes.

9    THE COURT:  And upon your release, sir, I will place

10   you on a period of supervised release of 5 years.  I will impose

11   the standard and mandatory conditions of supervision adopted by

12   the Court and the probation office, and the following special

13   conditions:  That you participate in a substance abuse treatment

14   program and follow the rules and regulations of that program, to

15   include submission to substance abuse testing.  Also, that if

16   directed to do so, you participate in a mental health treatment

17   program and follow the rules and regulations of that program.

18   Also, if directed, that you participate in a vocational services

19   program and follow the rules and regulations of that program, if

20   directed.

21   You must also pay a mandatory special assessment of

22   $100.

23   The plea agreement did provide for forfeiture.  Is

24   there any order?

25   MR. HANLON:  Nothing we've identified, Your Honor.  So

1   no order.

2         THE COURT: So there will be no forfeiture. And for

3   the reasons stated in the Presentence Report, it does not appear

4   to me the defendant is able to pay a fine. Therefore, I will

5   waive imposition of a fine due to financial hardship. I cannot

6   waive the mandatory special assessment.

7         In my view, this sentence is sufficient, but not

8   greater than necessary.

9         I would also recommend the RDAP program. And I ask

10   counsel now, is there any specific request?

11         MR. DEMARTIN: Just geographical locations, Your Honor.

12   No specific.

13         THE COURT: To Baltimore?

14         MR. DEMARTIN: Yes.

15         THE COURT: As close to Baltimore as possible.

16         Is there any legal objection coming from the

17   government?

18         MR. HANLON: No, Your Honor.

19         THE COURT: From the defense?

20         MR. DEMARTIN: No, Your Honor.

21         THE COURT: In Paragraph 13, sir, you did waive many of

22   your rights to appeal. You reserved the right to appeal any

23   sentence that exceeds the statutory maximum. This sentence was

24   definitely not in excess of the statutory maximum. You reserved

25   right to appeal a determination that you're a career offender,

1    but the Court did not find you to be a career offender.

2            All of that having been said, if you wish to note an

3    appeal, sir, that's up to you.  You have 14 days from the entry

4    of a Judgment and Commitment Order to note an appeal.  I would

5    ask defense counsel to confirm contact with the defendant during

6    the appeal period in the event he does wish to note an appeal.

7            Did I leave anything out?  Any open counts?

8            MR. HANLON:  Yes, Your Honor, there are open counts.

9    The defendant pled guilty to Count One of the second superseding

10   indictment.  The government moves to dismiss the original

11   indictment and the second -- I'm sorry -- and the superseding

12   indictment as to the defendant.  And the government moves to

13   dismiss any open counts, apart from Count One, of the second

14   superseding indictment.

15           THE COURT:  All right.  Thank you.  That motion will be

16   granted.  I did want to ask the probation agent if she will be

17   submitting a new presentence report because I did not apply, as a

18   practical matter, the enhancements that were in there.  And that,

19   of course, affects the guideline calculation.

20           MS. WONNEMAN:  Yes, Your Honor, I will amend the report

21   and resubmit it.

22           THE COURT:  Okay.  So the Presentence Report will not

23   reflect the six-level enhancement which, of course, would have

24   raised the guidelines.

25           MS. WONNEMAN:  Correct, Your Honor.

1          THE COURT:  Okay.  Anything else, counsel?

2          MR. DEMARTIN:  Your Honor, can we address his credit?

3          THE COURT:  Yes.

4          MR. DEMARTIN:  He has some state custody credit I

5  believe he should be entitled to.  When they served the warrant

6  on the Baltimore City house, there was also one served in Harford

7  County, and he was incarcerated on that for some marijuana, I

8  believe, and some cocaine that was found in the house.  No?  Just

9  marijuana.  Be that as it may, I think he bailed out on that.

10  But then a violation warrant came up and he was incarcerated in

11  Baltimore City on the violation for the CDS probation he was on.

12  And that was dismissed without any credit.

13          So we've been in continuous custody, state custody,

14  since April 15th of 2017.

15          THE COURT:  Okay.  I have September 20 of 2017.

16          MR. DEMARTIN:  That was federal custody.  But the

17  state, I would ask the Court to consider giving him credit for

18  the state.  He was arrested in Harford County based on these same

19  charges.

20          THE COURT:  And nothing was applied to a state

21  sentence?

22          MR. DEMARTIN:  No.  Those charges were dismissed in

23  Harford County, as well as the violation, which was also holding

24  him in Baltimore City.

25          THE COURT:  And what's the date?  You said April what?

1          MR. DEMARTIN:  15th of 2017.

2          THE COURT:  Okay.  Mr. Hanlon, any comment?

3          MR. HANLON:  Your Honor, I don't have any problem with

4    the Court recommending the defendant receive any credit he's due.

5    Obviously, the Bureau of Prisons --

6          THE COURT:  Sure.  I'm going to tell him that.

7          MR. HANLON:  But I have no problem with any of the

8    recommendations.

9          THE COURT:  But do you agree with that date?

10         MR. HANLON:  Yes, Your Honor.  That sounds right.

11         THE COURT:  Okay.  So I'm going to recommend that the

12   defendant get credit from April 15 of 2017.  And the way it

13   works, Mr. Harris, is that will go on your Judgment and

14   Commitment Order.  But, ultimately, the Bureau of Prisons makes

15   the final decision.  Now, if you're unhappy with their decision

16   -- and maybe they'll agree with you and me.

17         But if you're unhappy, there is a mechanism to

18   challenge it through the administrative remedy procedure.  But if

19   that time was not credited to any other sentence, you should get

20   the credit.  But, ultimately, the Bureau of Prisons, just like

21   with the designation of a sentence, where it's served, the Court

22   can recommend, but they have their process and they make those

23   decisions.

24         Good luck to you, sir.

25         THE DEFENDANT:  Thank you, Your Honor.

1          THE COURT:  We'll stand in recess.

2          (Conclusion of Proceedings at 1:26 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## REPORTER'S CERTIFICATE

I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. Antoine Harris, Case Number(s) ELH-17-322, on December 19, 2018.

I further certify that the foregoing pages constitute the official transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

In Witness Whereof, I have hereunto affixed my signature this _____ day of _____ , 2020.


_____/S/_____
Mary M. Zajac,
Official Court Reporter