IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

ANTOINE HARRIS,
*Defendant.*

CRIMINAL NO.:  ELH-17-0322

**MEMORANDUM OPINION**

Defendant Antoine Harris, who is self-represented, has filed a motion for compassionate release or reduction in sentence, pursuant to 18 U.S.C. § 3582(c)(1) and The First Step Act of 2018.  ECF 442.  The submission is supported by exhibits.  Harris is serving a 114-month sentence for conspiracy to distribute heroin, in violation of 21 U.S.C. § 846.  ECF 304.

The government opposes the motion (ECF 456), supported by exhibits.  Harris has replied. ECF 465.  Harris has also filed supplements (ECF 467, ECF 468), with exhibits.  In addition, several individuals have written to the Court in support of Harris.  *See* ECF 463, ECF 464, ECF 466.

I shall refer to defendant's submissions collectively as the "Motion."  No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion, without prejudice.

**I.      Procedural and Factual Background**

On September 6, 2017, defendant and ten codefendants were charged in a Superseding Indictment.  ECF 21.  In particular, defendant was charged with conspiracy to distribute heroin and fentanyl, in violation of 21 U.S.C, § 846.

Defendant entered a plea of guilty on August 23, 2018.  ECF 217.  The plea was tendered pursuant to a Plea Agreement.  ECF 218.  As to the calculation under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G."), the parties had several disputes, outlined in the Plea Agreement.  *Id.* ¶ 6(b).  In addition, Harris reserved the right to argue that he did not have actual knowledge that one of the drugs was fentanyl.  *Id.* at 9.  Moreover, he reserved the right to appeal a finding that he qualified as a career offender.  *Id.* ¶ 13(b)(i).  Ultimately, because the plea was entered under Rule 11 (c)(1)(C) (ECF 218, ¶ 9), the attorneys agreed it was unnecessary for the Court to resolve the parties' disputes.

The Plea Agreement contained a lengthy factual stipulation.  It stated, *id.* at 9-11:

> During 2016 and 2017, investigators with the Drug Enforcement Administration (DEA) and the Baltimore Police Department (BPD) conducted an investigation of drug-trafficking in the Baltimore, Maryland area and elsewhere.

> Antoine Harris was identified as a member of a drug distribution conspiracy whose members purchased narcotics from suppliers in Mexico, arranged for the importation of the narcotics into the United States, and distributed the narcotics in the Baltimore area. The evidence of Harris's membership and participation in the conspiracy included physical surveillance of his activities and the activities of his coconspirators; wiretaps during which Harris and his accomplices were monitored while planning and discussing drug transactions over cellular phones, including text message and voice calls; drug seizures from various locations; and other evidence. Harris admits that he did conspire and agree with other persons to distribute heroin and fentanyl, in Maryland and elsewhere. It was reasonably foreseeable to the Defendant that at least 400 grams of fentanyl and 1 kilogram of heroin would be or were distributed in furtherance of the conspiracy.  The Defendant reserves the right to argue that he did not have actual knowledge that one of the drugs was fentanyl.

> During early 2017, investigators conducted a court-authorized wiretap on a cellular phone used by Harris. Harris acquired heroin and fentanyl from suppliers. On multiple occasions during early 2017, investigators overheard Harris planning to receive narcotics.  Harris would then make arrangements with various accomplices to receive the narcotics and to distribute the narcotics to customers. A few examples of such communications follow (but these are only samples, they do not represent all of the drug-related communications in this case):

> On January 13, 2017, monitored calls indicated that Harris would be meeting with a supplier for a drug deal. During the same time frame, Harris and a

co-conspirator engaged in phone calls during which the two discussed meeting later.

On January 26, 2017, Harris was in the process of making arrangements to receive and distribute narcotics. Harris and a co-conspirator engaged in phone calls in which the accomplice helped to make arrangements for the drugs to be available for customers from a stash location maintained by the conspiracy on Fox Street in Baltimore City, Maryland.  A customer was stopped and arrested after leaving the stash location and was found in possession of heroin and other drugs.

[On] January 31, 2017, Harris was preparing to acquire narcotics from his supplier.  Harris and a co-conspirator engaged in phone calls in preparation for the deal. During one call. [sic] Harris asked the co-conspirator if he was ready. The two discussed whether the conspiracy had particular items necessary for the preparation and packaging of drugs for distribution, and whether one of the other members of the conspiracy had the necessary supplies. During surveillance that same day, law enforcement investigators observed the co-conspirator, along with other members of the conspiracy, going to and from the house on Fox Street, Baltimore, Maryland.

On January 16, 2017, Harris and a coconspirator engaged in a phone call during which Harris and the coconspirator discussed making sure another conspirator was "woke" and had what he needed. Harris told the coconspirator to make sure the other conspirator had really big clear bags that seal at the top.

On January 20, 2017, Harris and the coconspirator engaged in a phone call during which Harris asked the coconspirator about the "mix" and the two confirmed how much was left. Harris initially thought they had 40 left, but the coconspirator clarified that they had 39 left. The reference to mix was a reference to narcotics mixed with cutting materials for distribution.

On February 15, 2017, Harris and a coconspirator engaged in a phone call during which Harris told a coconspirator to do him a favor, to do the "whole," the "whole thing yo, the uh 28." The coconspirator confirmed those instructions.

On March 26, 2017, Harris engaged in a phone call with a coconspirator during which the coconspirator agreed to meet with a customer to facilitate a drug transaction for the conspiracy. The coconspirator agreed to meet with the customer for Harris.

During March 2017, Harris and his supplier, TJ, planned a transaction in which Harris would acquire a "whole." Harris and TJ met at 8856 Pennsbury Place, another location used by the conspiracy to store narcotics. During one intercepted call, Harris engaged in a conversation with another accomplice to confirm when that person would arrive at Pennsbury. In the background, investigators could hear TJ, who was waiting at Pennsbury with Harris, complaining about having to wait and talking about selling "dope." Harris agreed to meet his accomplice at a location.

Investigators observed TJ leave Pennsbury. Later, Harris's other accomplice arrived at Pennsbury. That accomplice later left Pennsbury and his vehicle was stopped by law enforcement. That accomplice was not in possession of any narcotics at that time.[1]

In the days leading up to April 12, 2017, investigators intercepted a series of phone calls between Harris and TJ. During the calls, Harris made arrangements to acquire a quantity of narcotics from TJ. Investigators conducted surveillance at the Pennsbury residence and observed TJ's vehicle arrive at the location and depart, consistent with TJ dropping something off at the location. During the corresponding timeframe, TJ and Harris also exchanged text messages during which TJ advised Harris that TJ had arrived at the location, and later that TJ had departed safely. Based on the surveillance and communications, investigators believed that TJ had dropped off a supply of narcotics at the Pennsbury location.

On April 12, 2017, investigators executed search warrants at the Pennsbury residence. Harris was not present. During the search, investigators found a quantity of suspected narcotics behind a dresser. The substance was lab-tested and was confirmed to be just over one kilogram of fentanyl, a schedule II controlled substance. Harris admits that he was in knowing, constructive possession of that fentanyl at the time of its recovery, that he had received the fentanyl from a supplier, and that he intended to distribute the fentanyl to other persons as part of the conspiracy discussed herein.

On April 12, 2017, investigators executed search warrants at other locations used by the conspiracy as stash locations. One of the searches was at 2808 Fox Street. From the Fox Street location, investigators found narcotics packaging material and non-narcotics substances used as cutting material. Investigators also located two members of the conspiracy.

Sentencing was held on December 17, 2018. ECF 303. At the time of sentencing, defendant was 47 years old. ECF 255 (Presentence Investigation Report or "PSR") at 2. He was 5'8" tall and weighed 239 pounds. *Id.* ¶ 70. The PSR also detailed various health conditions of the defendant, including diabetes, high blood pressure, arthritis, a tumor on his cheek, a history of surgeries, and blindness in one eye. *Id.* ¶¶ 71-73. In addition, the defendant had a documented history of mental health issues. *Id.* ¶¶ 74-77. And, he had a history of substance abuse, dating to age 14. *Id.* ¶¶ 78-81.

---

[1] This paragraph includes the handwritten corrections that were initialed by the parties.

The PSR reflected several prior adult criminal convictions.  ECF 255, ¶¶ 37-42.  These offenses, discussed *infra*, included conspiracy to commit first degree murder in 1990, when the defendant was 19 years of age.  *Id.* ¶ 38.  For that offense, Harris received a 25-year sentence in 1991 and he was paroled in 2004.  *Id.*

The Court found that the defendant had an adjusted offense level of 29 and a criminal history category of IV.  The Guidelines called for a sentence of incarceration ranging from 121 to 151 months.  ECF 456-1 (Sentencing Transcript) at 6.  At sentencing, Harris presented moving allocution.  *Id.* at 19-25. As indicated, the Court sentenced the defendant to 114 months of imprisonment.  ECF 304.[2]

Harris is currently incarcerated at FCI Petersburg Medium.  *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited November 30, 2022).  He has a projected release date of June 28, 2024.  ECF 480-1.  With credit for pretrial detention dating from April 15, 2017, Harris has served about 67 months of his 114-month sentence, or approximately 60% of his sentence.

On December 3, 2020, Harris submitted a request for compassionate release to the Warden of FCI Petersburg Medium, where he is currently incarcerated, pursuant to 18 U.S.C. § 3582(c).  ECF 442-1.  He received no response, and this Motion followed.  ECF 442.  Harris seeks a reduction of his sentence to time served due to the COVID-19 pandemic.  *Id.* at 1.  Significantly, defendant notes that he contracted COVID-19 in December 2020, and that, in light of his chronic medical conditions, he has an elevated risk of severe illness.  *Id.* at 11.  In particular, he asserts that he "suffers from diabetes, hypertension, and hyperlipidemia."  *Id.*

The government concedes that defendant has had "serious bouts with COVID-19."  ECF

---

[2] The government sought a sentence of 144 months of imprisonment.  ECF 456-1 at 15.

468 at 6.  Defendant's medical records indicate that defendant has tested positive for COVID-19 twice, once in December 2020, and again in January 2022.  ECF 456-2 at 24, 27.  But, the government contends that the Court "should take into consideration that [defendant] is vaccinated for COVID-19."  ECF 468 at 7.  According to defendant's medical records, Harris received his second dose of the Pfizer vaccine on March 24, 2021.  ECF 456-2 at 28.  In any event, the government argues that the balance of the sentencing factors in 18 U.S.C. § 3553(a) supports a denial of relief.  ECF 456 at 13-17.  The government does not contest that Harris has exhausted his administrative remedies.  *Id.* at 4.

Additional facts are included, *infra*.

## II.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Ferguson,* ___F.4th___, 2022 WL 17256572, at *3 (4th Cir. Nov. 29, 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 2022 WL 1725672, *3; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021);

*McCoy*, 981 F.3d at 276.  This constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[3]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy,* 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy,* 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy,* 981 F.3d at 282; *see also*

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*Jenkins*, 22 F.4th at 169; *United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, ___ F. App'x ___, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"

*United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments. *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release. Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194. And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

Even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see*

*Jenkins*, 22 F.4th at 167.  And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.   COVID-19[4]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of October 19, 2022, COVID-19 has infected more than 97 million Americans.  *See*

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed August 23, 2022).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges. Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has

repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In November 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (November 22, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk

category." *Id.* at 196.   Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).   However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").   Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,*'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective

equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[6]

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

---

correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Notably, there is no cure for the virus. But, medical treatments have continued to improve. And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax). *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html. Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons six months of age and older. *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of October 2022, approximately 68% of the total U.S. population is fully vaccinated, including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 93% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated October 20, 2022). Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age

18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated November 1, 2022).  And, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  Much has changed since that time.

As of November 30, 2022, the BOP had 144,753 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 339,863 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last accessed November 30, 2022).

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we soon experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-

omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Nov. 12, 2022).

COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. Times, Sept. 5, 2021,     https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html     ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").   In an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS News (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id.*  On the other hand, news reports suggest that we may experience yet another surge of cases in the coming months.  *See*, *e.g.*, *Quick and stealthy 'Scrabble variants' are poised to drive a winter Covid-19 surge*, CBS News (Oct. 20, 2022), https://www.cbsnews.com/baltimore/news/quick-and-stealthy-scrabble-variants-are-poised-to-drive-a-winter-covid-19-surge/.

With respect to the BOP, it has reported that, as of November 30, 2022, 239 federal inmates, out of a total population of 144,753, and 198 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 47,794 inmates and 14,594 staff have recovered from the COVID-19 virus.  In addition, 309 inmates and seven staff members have died from the virus.   The BOP has completed 128,662 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

23

With respect to FCI Petersburg Medium, where the defendant is imprisoned, the BOP reported that as of November 30, 2022, out of a total of 1,700 inmates, one inmate and one staff member have currently test positive, two inmates and zero staff members have died of COVID-19, and 261 inmates and 55 staff have recovered at the facility.  In addition, 405 staff members and 2,724 inmates have been inoculated with the vaccine at Petersburg FCC.  *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/btf/ (last visited November 30, 2022).

### IV.   Discussion

### A.  Medical Conditions

Harris's medical records indicate that he suffers from three conditions that the CDC identifies as risk factors for a more serious case of COVID-19: diabetes, hypertension, and hyperlipidemia.  ECF 456-2 at 7.

As noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*. Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions, such as those applicable to Harris.  *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary

and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason).  There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

The government argues that the Court "should take into consideration that [defendant] is vaccinated for COVID-19."  ECF 456 at 7.  It is without question that the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus.  But, they are not entirely effective, particularly as to the latest variants.  "The variants have shown a remarkable ability to get around the protection offered by infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, Balt. Sun (July 14, 2022).  Indeed, defendant contracted COVID-19, for the second time, after having been vaccinated.  ECF 456-2 at 27.

As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."  Therefore, the fact of vaccination or prior infection does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release.  Accordingly, the fact that Harris has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release."  *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

As illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable.  In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022).  Indeed, an analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave." Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 12 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series.  *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3MdQMM6 (last updated August 23, 2022).  Moreover, all adults ages 50 years and older are eligible for a second booster shot.  *See id.*  But, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status.  *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL

356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

"At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

In light of the evolving circumstances regarding COVID-19, coupled with defendant's medical issues, I conclude that Harris's vaccination status does not render him ineligible for compassionate release. Nor is defendant's eligibility for compassionate release defeated because he has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

Therefore, I am satisfied that Harris satisfies the "extraordinary and compelling" prong of the § 3582 analysis. However, that determination does not end the inquiry.

### B.  Section 3553(a) Factors

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when, as here, a court finds extraordinary and compelling reasons for compassionate release, relief

is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186. The Court must also consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community. U.S.S.G. § 1B1.13(2).

In my view, a balancing of the § 3553(a) factors readily indicates that defendant's release from prison is not warranted at this time.

As the government observes, Harris's crime of conviction was a serious one. Defendant was the leader of a large drug trafficking organization that smuggled and distributed at least 1400 grams of heroin and fentanyl into Maryland. ECF 218 at 9. Fentanyl and heroin are particularly dangerous substances. *See Fentanyl Facts*, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/stopoverdose/fentanyl/index.html (last accessed November 30, 2022); *Heroin Overdose Data*, Ctrs. For Disease Control & Prevention, https://bit.ly/3dPA8Ba (last accessed November 30, 2022). Accordingly, I agree with the government that the nature of Harris's offense weighs heavily here.

Furthermore, defendant's criminal history is substantial. In 1991, Harris was sentenced to 25 years' imprisonment and was paroled in 2004. ECF 255, ¶ 23. Moreover, Harris has three

28

adult convictions for felony drug offenses.  ECF 255, ¶¶ 37, 39, 42.  For one, he received a sentence in 2014 of ten years' incarceration with nine years, eight months, and twenty days suspended.  *Id.* ¶ 42.  Yet, this lenient sentence did not lead Harris to change his conduct.  Nor did the experience of a lengthy sentence, imposed in 1991, deter defendant.  To the contrary, Harris continued to engage in criminal activity, which culminated in his federal prosecution in this case.  And, defendant committed the offense at issue here while on probation for a felony drug offense committed in 2014.  *Id.* ¶¶ 42, 44.

The government also notes that in 2020 Harris was disciplined for possession of a hazardous tool.  ECF 456-4 (disciplinary record).  Harris received fifteen days disciplinary segregation for the infraction and lost telephone privileges for four months.  *Id.*

Conversely, in his Motion, Harris states that his "extraordinary rehabilitation shows that he is ready for re-entry."  ECF 442 at 29.  In particular, defendant has completed numerous education courses while incarcerated and is currently enrolled in the Drug & Alcohol Treatment Specialist program.  ECF 442-3.  And, in his release plan, Harris notes his desire to spend time with his children.  ECF 442-4 (release plan).  Moreover, Steven Dixon, Clinical Director of T.I.M.E. Organization, Inc.,[7] has offered to "assist Mr. Harris with his Re-entry and train him to assist others with their process."  ECF 468-1.  Additionally, his mother, cousin, and daughter submitted letters in support of his release.  ECF 459; ECF 464; ECF 466.

The Court applauds Harris for his positive efforts to return to society, and for his desire to spend time with his children.  But, "rehabilitation alone cannot serve as a basis for compassionate

---

[7] T.I.M.E. Organization, "is a substance abuse treatment center which provides wrap around services including individual counseling and group counseling provided by professional counselors, Re-entry for returning citizens, Life Skills training which includes workforce and employment development and mental health assessment and counseling if needed."  ECF 468-1.

release."  *Davis*, 2022 WL 127900, at *1.  In my view, a reduction in the length of the sentence would not adequately reflect the seriousness of the defendant's crime nor promote respect for the rule of law.

### V.      Conclusion

The § 3553(a) factors militate against Harris's immediate release.  In sum, the Court remains troubled by the serious nature of defendant's offense of conviction and Harris's criminal history, reflecting his repeated failure to conform his conduct to societal expectations.  These considerations compel me to deny the Motion, without prejudice.  Simply put, this is not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.

An Order follows, consistent with this Memorandum Opinion.


Date: November 30, 2022                        _____/s/_____

                                                                Ellen L.  Hollander
                                                                United States District Judge


`

30